IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville June 23, 2015


SHANE MICHAEL GROGGER v. STATE OF TENNESSEE


Appeal from the Circuit Court for Overton County
No. 5990     Leon C. Burns, Jr., Judge

_____

No. M2014-01615-CCA-R3-PC – Filed July 13, 2015

_____


Petitioner, Shane Michael Grogger, appeals the denial of his petition for post-conviction relief.  He argues that his trial counsel provided ineffective assistance by failing to adequately investigate Petitioner's mental health issues and by failing to raise the rejection of a requested jury instruction as an issue on direct appeal.  After a careful review of the record, the decision of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Josh Hoeppner, Livingston, Tennessee, for the appellant, Shane Michael Grogger.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Mark E. Gore, Assistant District Attorney General, for the appellee, State of Tennessee.



**OPINION**

        This is an appeal from the Overton County Circuit Court's denial of Petitioner's petition for post-conviction relief.

*Facts and Procedural Background*

Petitioner was convicted of especially aggravated robbery, two counts of first degree murder, and two counts of abuse of a corpse for his involvement in the killing of Sandra and L.J. Looper in 2005. *State v. Shane Michael Grogger*, No. M2008-02015-CCA-R3-CD, at \*1 (Tenn. Crim. App. Nov. 17, 2009), *perm. app. denied* (Tenn. Apr. 14, 2010). For these crimes, he received an effective sentence of life imprisonment plus fifteen years. *Id.* His convictions were upheld on direct appeal. *Id.*

On February 15, 2011, Petitioner filed a pro se petition for post-conviction relief. The post-conviction court entered a preliminary order appointing counsel, who filed an amended petition on May 21, 2014.[1] Petitioner claimed that his trial counsel provided ineffective assistance by failing to adequately investigate Petitioner's mental health and by failing to appeal the trial court's denial of a request for a jury instruction on accessory after the fact. The post-conviction court held an evidentiary hearing on July 25, 2014.

Dr. James Walker testified that he was the Director of Neuropsychology Consultants. He was a board-certified neurologist and forensic psychologist, and he was a licensed psychologist in four states. Dr. Walker had previously testified as an expert witness approximately 200 times, and the post-conviction court qualified Dr. Walker as an expert without objection from the State.

On March 21, 2014, Dr. Walker performed a forensic neuropsychological and psychiatric evaluation of Petitioner over the course of six or seven hours. He had previously performed "several hundred evaluations of criminal defendants," including "about eighty capital murder cases" and "approximately twenty-five evaluations around the specific issue of false confessions." Dr. Walker was assisted by Dr. David Street, a forensic psychiatrist.

Post-conviction counsel asked Dr. Walker to evaluate Petitioner for mental health issues that may have been relevant to this case, including whether Petitioner had the capacity to make statements to law enforcement officials during their interrogations. Prior to and in preparation for the forensic neuropsychological and psychiatric evaluation, Dr. Walker reviewed Petitioner's medical records. He also reviewed the discovery information produced in Petitioner's criminal case, including descriptions of the crime scenes and the recordings of Petitioner's interrogations by law enforcement officials. Dr. Walker also reviewed the transcript of the trial and this Court's opinion in Petitioner's direct appeal. Dr. Walker's evaluation of Petitioner consisted of the administration of seven tests: Green's Medical Symptom Validity Test ("MSVT"), Mini Mental State Examination ("MMSE"), Wechsler Adult Intelligence Scale-IV ("WAIS-IV"),

---

[1] The post-conviction court granted numerous requests from Petitioner for additional time to secure the assistance of a medical expert.

Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), Trail Making Test ("TMT"), Personality Assessment Inventory ("PAI"), and Gudjonsson Suggestibility Scale ("GSS"). After the evaluation, Dr. Walker prepared a formal report of his findings and conclusions, which was entered as an exhibit at the evidentiary hearing.

Petitioner scored perfectly on the performance validity test, which Dr. Walker used to ascertain whether Petitioner was "faking" or attempting to distort his test results. Consequently, it was "very clear" to Dr. Walker that Petitioner was not trying to fake his performance during the evaluation.

The PAI is a questionnaire of 344 questions about symptoms of psychiatric problems. Petitioner acknowledged a serious problem with drugs in his past as well as current drug-related symptoms and problems. Petitioner described some difficulties with social detachment and described himself as suffering from a very severe and upsetting event in his past, which Dr. Walker believed to be the crimes in this case. Petitioner scored outside of the normal limits on the schizophrenia and drug abuse scales. These results suggested that Petitioner either "has no mental disorder, . . . has alcohol abuse, or . . . has a personality disorder." The test contained several validity questions designed to indicate if an examinee was faking, and Petitioner did not exhibit any responses that suggested that he was attempting to make himself look better or worse than he actually was. Dr. Walker determined that he was being "straightforward and honest" during this test.

Petitioner performed "very well" on the four tests used to determine cognitive functioning. Petitioner's "ability to learn new information, to remember information, to use language in his executive functioning skills were all measured within normal limits." Petitioner's "intelligence fell within average limits," and he did not "appear to have any serious difficulties with his reasoning and thinking." However, Petitioner scored "in the mildly impaired range with regard to his attention skills." Petitioner's immediate memory skills also fell within the mildly impaired limits. Dr. Walker found these "mild irregularities" to be consistent with the nature of a brain injury sustained by Petitioner.

In 1997, when Petitioner was twenty years old, he attempted suicide by firing a .22 caliber bullet into the roof of his mouth, which went through the right frontal lobe of his brain. The right frontal lobe of the brain is not involved with cognitive functioning but instead is "highly involved in a person's personality," that is, a person's "emotional characteristics" and the "ability to relate effectively to other people." Consequently, Petitioner "struggles a great deal" with "his ability to manage relationships, to hold his own in relationships, to assert himself, to take care of himself, to figure out what's right and wrong, good and bad, what [he] should do, [and] what [he] shouldn't do." Dr. Walker described Petitioner as having "a hole in his brain and a hole in his personality."

However, Dr. Walker acknowledged that he had spoken with Petitioner's mother, and she said that her impression was that the brain injury had not altered Petitioner's personality because "he was basically just shy, quiet, and compliant" as a child. One of Dr. Walker's formal conclusions from the evaluation was that Petitioner "has a profoundly passive personality style."

Throughout the evaluation, Dr. Walker observed that Petitioner's behavior was "exceptionally polite," "very courteous," "very cooperative," and "submissive." Petitioner was "somewhat anxious" but capable of conversation "in a pretty normal fashion." However, Petitioner's anxiety interfered with his ability to develop a "rapport" with Dr. Walker. Petitioner "appeared to be open and honest" based upon his mannerisms and his ability to discuss various aspects of his life and his relationships.

Regarding this case, Dr. Walker found Petitioner's attitude toward his codefendant as "very odd" because Petitioner seemed "subservient," "passive," and deferential. Petitioner persistently referred to him as "Mr. Johnson" and as "sir." Dr. Walker viewed the lack of animosity or disdain as "very strange" given the codefendant's "catastrophic effect" on the lives of Petitioner and the victims in this case.[2]

Petitioner appeared to be "very susceptible to influence by other people." Dr. Walker noted that Petitioner displayed "deferential obsequious passive behavior." He was "very willing to comply in anything that we asked him to do." Petitioner was "among the most polite, the most courteous, the most deferential, the most passive of the patients" observed by Dr. Walker. Petitioner appeared to be a person "who doesn't feel very sure of himself in social relationships and social interactions with others" and who is "very conscious of authority" and "social status." Petitioner "tends to do what he's told, to not ask questions, and to be extremely pleasant" to anyone he perceives as possessing a higher social status.

Petitioner performed "very poorly" on the GSS, which is one of the leading tests on suggestibility in the field of forensic psychology. The scale ranges from zero to forty, and the average score is a seven. A score above sixteen or seventeen indicates that a person is "very suggestible." Petitioner's score of twenty-two was beyond the 99th percentile of suggestibility indicating the he is "extremely suggestible." However, Dr. Walker acknowledged that this was the last test administered to Petitioner during the six hour session. He admitted that it was possible that Petitioner "may have missed some of [the questions] because he wasn't focused," given that Petitioner also has issues maintaining attention.

---

[2] Petitioner's codefendant was Harold Johnson. At the time of the offense, Mr. Johnson was romantically involved with the mother of Petitioner's girlfriend. The victims in this case were Mr. Johnson's daughter and her husband.

On one occasion during the evaluation, Dr. Walker presented a brief written statement to Petitioner and asked Petitioner to endorse the statement with his signature so that Dr. Walker could be paid for his work. Dr. Walker intentionally included inaccurate information in the statement. The purpose of this request was to probe whether Petitioner was "the kind of person who really would sign something without even reading it, without even evaluating it critically." Petitioner readily signed the statement without reading it. Petitioner's behavior in this instance was evidence that he was "very susceptible to doing what he's told."

Based on his evaluation, Dr. Walker made the formal conclusion that Petitioner's "signed confession is suspect." In his report, Dr. Walker provided the following explanation for his conclusion: "While [Petitioner] was pressured by his interrogators to admit to prior knowledge of the planned murders, [Petitioner] currently maintains, as he maintained at his trial, that he in fact had no knowledge of these events." Dr. Walker explained that by "pressured" he meant that "[t]he interrogators did not accept his negative responses . . . and repeatedly, the line of questioning happened over and over and over again, where they simply would not take no for an answer." During the interrogations, the interviewers would repeatedly tell Petitioner that his answers were unacceptable, causing Petitioner to alter his responses. Sometimes, Petitioner would respond to leading questions by feeding suggested information back to the interviewer. After reviewing the interrogations and personally observing Petitioner's suggestibility, Dr. Walker was "concerned about his susceptibility to being misled" in his statements to police. Dr. Walker opined that Petitioner was "probably" as suggestible at the time of the crimes as he was during the evaluation.

During cross-examination, Dr. Walker said that by his use of the word "suspect" he meant "open to question"; he did not mean that this style of questioning was "unconstitutional coercion." Dr. Walker explained that it was "not [his] job to say if [the confession]'s true or false. . . . It's [his] job to say, [there are] issues here that the court should consider in trying to determine whether [Petitioner]'s statements were true or false." Dr. Walker insisted, "My testimony today . . . is that [Petitioner] has a tendency, when pressured by other people, to say things that they want him to say. That's all."

Dr. Walker acknowledged that there were instances during the interrogations in which Petitioner persisted in maintaining the same answers in response to repeated questioning. Dr. Walker said that this was not inconsistent with his conclusions and explained:

What I would suspect would be that [Petitioner] would feel internal pressure to respond positively to what the officers were asking. It doesn't mean that in each and every circumstance he's going to give into that

- 5 -

pressure. But he feels more pressure than the average person to do what others are suggesting him to do.

Dr. Walker also acknowledged that Petitioner made some false statements to him during his evaluation. Specifically, Petitioner denied telling the police that he knew about his codefendant's plan before the crime, which Dr. Walker knew to be untrue. Dr. Walker also acknowledged that Petitioner's medical records contained some false information provided by Petitioner. For example, he reported to his doctors that he suffered his head injury by falling off of a bicycle rather than by a gun. Dr. Walker did not believe that any lies and inconsistencies that he observed from Petitioner undermined his conclusion about Petitioner's suggestibility because, as he explained, "in general, I got the truth from [Petitioner], with some notable exceptions."

Dr. Walker agreed that Petitioner had been competent to stand trial.

Trial counsel testified that he had approximately twenty-eight years of experience when he represented Petitioner. At that time, he had been through thirty to thirty-five criminal trials. Petitioner's case was his fourth murder trial. Trial counsel stated that a defendant's mental health background was an "important" consideration for him in developing a defense. Typically, trial counsel would first inquire about a defendant's mental history during an interview. Trial counsel would also "make [his] own personal observations of whether there appears to be a mental issue involved" when interacting with a defendant.

Trial counsel became aware of potential mental health issues during his first interview with Petitioner because Petitioner revealed his previously attempted suicide. Petitioner said he was trying to spare his mother from difficulties in helping Petitioner defend against a charge of driving under the influence. Petitioner did not reveal the manner of the attempted suicide and did not inform trial counsel that he had suffered a brain injury. Petitioner said that he subsequently "spent a period of time" at Middle Tennessee Mental Health Institute. However, trial counsel explained why he eventually determined that Petitioner's mental health was not relevant to the defense:

> During the course and the time period of my discussions with [Petitioner], I did not personally observe anything that would indicate to me that he was incompetent. And also during that time period, there was a competency hearing that was done, and it was determined that he was competent to stand trial. So, there was nothing initially that I was able to observe that would indicate that he wasn't competent to assist me or [that] there were any mental issues. I did have . . . one or two short discussions where I asked him about the attempted suicide, and he basically downplayed it for whatever reason. . . . So, based upon that and the fact that he was found

competent, and the fact that I could not see anything in my interactions with him that indicated that there was a mental issue involved, I did not pursue that with him.

Trial counsel also interacted with Petitioner's mother during the case, but she did not express any concern about Petitioner's mental condition or abilities.

Trial counsel knew how to obtain a forensic mental health evaluation for Petitioner because he had done that before with other clients. He agreed with Dr. Walker's observations about Petitioner's passive personality, but trial counsel did not feel that he needed to pursue additional forensic evaluation because the competency report did not raise any mental health issues.

Trial counsel did not attempt to suppress Petitioner's statements to law enforcement officials because, after reviewing the discovery, trial counsel "did not feel that there was enough to render it involuntary." However, trial counsel stated that he would have used Dr. Walker's testimony, if it had been available, as the basis for a motion to suppress Petitioner's statements, but trial counsel also opined that the outcome of the trial likely would not have been different. Trial counsel explained that susceptibility as a basis for suppression of statements was a "novel" argument at that time and had not been addressed by a Tennessee case until 2011 in *State v. Ted Ormand Pate*, No. M2009-023120CCA-R3-CD, 2011 WL 6935329 (Tenn. Crim. App. Nov. 22, 2011), *perm. app. denied* (Tenn. Apr. 11, 2012). Consequently, susceptibility was not an issue that trial counsel was aware of or felt would have been successful during the trial in 2008.

Specifically regarding the statements made by Petitioner to law enforcement officials, trial counsel said that Petitioner's version of the events indicated that Petitioner did have prior knowledge of his codefendant's intent to shoot the victims but simply did not believe that his codefendant was serious. Trial counsel explained:

[Petitioner] consistently maintained that there was some discussion between he and [his codefendant]—that [codefendant] made the statement, "I'm going to get that car. I'm going to shoot them.". . . [I asked,] "Well, why didn't you do something?" He said, "That's something that's so strange and so out of the ordinary that I didn't believe him."

Trial counsel said that this statement was consistent with Petitioner's trial testimony. Part of their defense strategy was to portray the codefendant as a "storyteller" and a "liar," a person that no one would believe was being serious with such statements.

Trial counsel also noted that Petitioner "stood up well for himself" during the cross-examination of his testimony and did not appear suggestible to the prosecutor's questioning.

Prior to jury deliberation, trial counsel requested that the judge instruct the jury on accessory after the fact. He requested the instruction "even though case law indicated that accessory after the fact was not a lesser included offense of the murder charge." The judge denied the request. Trial counsel raised the denial of this request in the motion for new trial, but he did not raise it as an issue on appeal. Trial counsel could not explain why he chose not to pursue the jury instruction issue on appeal, but he testified that he did not believe that it would have been successful as a reversible error. Trial counsel also opined that he did not think an instruction on accessory after the fact was fairly raised by the proof at trial. During closing argument, trial counsel argued facilitation to the jury.

After the defense's proof, the State called Agent Steve Huntley of the Tennessee Bureau of Investigation. Agent Huntley interviewed Petitioner at the Putnam County Sherriff's Office after the victim's bodies were discovered. The State introduced an audio recording of the Agent Huntley's first interview with Petitioner. Agent Huntley discussed this interview and the subsequent interviews that he had with Petitioner.

The post-conviction court determined that Petitioner had not proven that he received ineffective assistance of counsel on either issue and denied post-conviction relief. Petitioner filed a timely notice of appeal.

*Analysis*

On appeal, Petitioner claims that he received ineffective assistance of trial counsel because trial counsel (1) did not fully investigate Petitioner's mental health issues, which precluded the presentation of expert testimony about Petitioner's high suggestibility, and (2) did not appeal the trial court's refusal to instruct the jury on accessory after the fact as a lesser included offense. The State contends that the trial court did not err in denying post-conviction relief because Petitioner failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Burnett v. State*, 92 S.W.3d 403, 408 (Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). A defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). This Court will not use hindsight to second-guess a reasonable trial strategy, *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994), even if a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. Prejudice is shown where "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Id.*

Whether a petitioner has been denied the effective assistance of counsel presents a mixed question of law and fact. *Burns*, 6 S.W.3d at 461. This Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). This Court will not re-weigh or re-evaluate the evidence presented or substitute our own inferences for those drawn by the trial court. *Henley*, 960 S.W.2d at 579. Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *Momon*, 18 S.W.3d at 156 (citing *Henley*, 960 S.W.2d at 578). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields*, 40 S.W.3d at 458.

Petitioner argues that trial counsel failed to adequately investigate his mental health issues. Defense counsel has a duty to investigate "all apparently substantial defenses available." *Baxter*, 523 S.W.2d at 935 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)); *see also Burns*, 6 S.W.3d at 462. However, "[w]hen assessing the performance of trial counsel, courts must . . . evaluate the challenged conduct from counsel's perspective at the time, rather than from the perspective of a mental health expert offering testimony at a post-conviction proceeding." *Henley*, 960 S.W.2d at 583. Such an assessment should take into account information supplied to trial counsel by a defendant's friends and family, a defendant's own representations, or lack thereof, about his or her mental health, and trial counsel's own observations and experience with the defendant. *See, e.g.*, *Blain Steven Covert*, No. E2013-02531-CCA-R3-PC, 2014 WL 4345724, at *8 (Tenn. Crim. App. Sept. 16, 2014) (finding deficient performance where trial counsel ignored information from the defendant's parents, his grandmother, and another relative that the defendant received mental health counseling and prescription medication as well as the defendant's own statements that he was recently diagnosed with multiple emotional disorders), *perm. app. denied* (Tenn. Feb. 12, 2014); *Demario Johnson v. State*, No. W2011-02123-CCA-R3-PC, 2013 WL 772795, at *8 (Tenn. Crim. App. Feb. 27, 2013) (finding no deficiency where trial counsel did not seek a mental health evaluation based upon the information supplied by the defendant during the intake interview and her own interactions with the defendant), *perm. app. denied* (Tenn. July 10, 2013); *Johnny Wayne Beard v. State*, No. W2011-00800-CCA-R3-PC, 2012 WL 952266, at * (Tenn. Crim. App. Mar. 20, 2012) ("We cannot conclude that the petitioner has shown any deficiency in counsel's failure to investigate his mental

health issues when he did not inform counsel of such."), *perm. app. denied* (Tenn. Aug. 15, 2012).

In this case, trial counsel was aware of Petitioner's attempted suicide and previous stay at a mental health facility. Consequently, trial counsel subjected Petitioner to a competency evaluation, which did not reveal any significant mental health issues. Petitioner "downplayed" his attempted suicide to trial counsel, and trial counsel had no other reason to believe that any mental health issues resulted from the suicide attempt. Petitioner's mother did not express any concern about Petitioner's mental health, and trial counsel's own observations of and experience with Petitioner suggested that Petitioner was functioning normally. We cannot conclude that trial counsel acted deficiently by not seeking further mental evaluation of Petitioner or by not making more extensive inquiry into the factual circumstances of Petitioner's attempted suicide. *Cf. Wadie Michael Holifield v. State*, No. W2008-02040-CCA-R3-PC, 2009 WL 2581282, at *8 (Tenn. Crim. App. Aug. 21, 2009) (finding trial counsel did not act deficiently by not investigating mental health issues where she "was only aware that the petitioner was depressed and had made a half-hearted attempt to commit suicide" and the defendant "did not inform trial counsel of any problems from which he was suffering"), *perm. app. denied* (Tenn. Feb. 22, 2010). Because Petitioner has failed to prove deficiency, we decline to address the prejudice requirement of his ineffective assistance claim. *See Goad*, 938 S.W.2d at 370.

Petitioner's second argument is without merit. At the time of Petitioner's trial, as now, accessory after the fact was not a lesser included offense of any crime. *State v. Hodgkinson*, 778 S.W.2d 54, 63 (Tenn. Crim. App. 1989) ("Accessory after the fact is a separate and distinct offense and is not a lesser included offense."); *State v. Hoosier*, 631 S.W.2d 474, 476 (Tenn. Crim. App. 1982); *see* T.C.A. § 39-11-411. Trial counsel's failure to raise the jury instruction issue on appeal was neither deficient nor prejudicial where such issue was clearly rejected by established case law and trial counsel was without justification to argue for a change in the law. *See Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004).

*Conclusion*

For the foregoing reasons, the decision of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE